IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICKEY C. MENEWEATHER, JR., )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>DR. STEPHEN RITZ and )<br>DR. MARLENE HENZE, )<br>)<br>Defendants. ) | Case No. 19 C 6643 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Rickey Meneweather, who at the time relevant to this case was imprisoned at Sheridan Correctional Center, has sued two physicians, Dr. Marlene Henze and Dr. Stephen Ritz, for their actions and their inaction in treating a condition in his right ear. Mr. Meneweather lost all hearing in that ear, and the loss is permanent. The defendants have moved for summary judgment. In considering the defendants' motion, the Court views the facts in the light most favorable to Mr. Meneweather and draws reasonable inferences in his favor. *See, e.g., Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020).[1]

Preliminarily, the Court notes that Mr. Meneweather's counsel did not comply with Local Rule 56.1, in that he did not file a point-by-point response to the defendants' statement of materials facts but rather simply filed a memorandum in response to the

---

[1] The Court thanks attorney Pericles C. Abbasi for his service as recruited counsel for Mr. Meneweather.

motion for summary judgment.  But it is clear from the memorandum exactly what Mr. Meneweather is contesting.  And all the relevant evidence—the depositions of the parties and experts, both sides' experts' reports, and the medical records—was provided via defendants' Local Rule 56.1 submission.  The Court has carefully reviewed all of that evidence in addressing the motion for summary judgment.  For these reasons, the Court exercises its discretion to overlook counsel's noncompliance with Local Rule 56.1, *see, e.g., Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011), and will rule on the merits rather than based on procedural formalities.

## Facts

Dr. Henze first saw Mr. Meneweather—who at the time was about 35 years old—on August 20, 2018, the same day he reported to a nurse that he had decreased hearing in his right ear "since this morning."  Mr. Meneweather reported that he was not in pain but that he had upper respiratory symptoms for the past several weeks that he attributed to allergies.  Dr. Henze examined both ears using an otoscope.  She reported in her notes that the left ear was completely normal.  Dr. Henze's notes further state:

> Right canal with some adherent cerumen and scant red blood due to recent traumatic removal of cerumen is appreciated.  Normal tympanic membrane landmark obliterated due to white posterior effusion. Decreased movement of the tympanic membrane.

Def.'s Ex. 10 (medical records) at ECF p. 4 of 80.[2]  Dr. Henze assessed Mr. Meneweather as having "otitis media with effusion," in other words, inflammation of the middle ear with some fluid, which she said resembled pus.  She prescribed Maxitrol, a combined steroid and antibiotic, to address the inflammation and presumed infection;

---

[2] Cerumen is commonly referred to as earwax.  The tympanic membrane is commonly referred to as the eardrum.

Bactrim DS, an antibiotic, for the same conditions; and Chlor-Trimeton, an allergy medication, to address nasal congestion.

After August 20, it appears that Mr. Meneweather was scheduled to see a physician on September 2, September 10, and September 17. However, none of these visits actually took place—the first due to a "scheduling error," and the others "due to time constraints." *Id.* at p. 6 of 80.

Dr. Henze saw Mr. Meneweather for the second and last time on September 27, 2018. Mr. Meneweather continued to report some hearing loss in the right ear. Dr. Henze noted that upon examination of his right ear, it appeared that the fluid was now clear and was no longer pus-like as it had been at the earlier visit. Dr. Henze's notes reflect that she suspected a eustachian tube dysfunction[3] and also diagnosed "mild otitis externa," inflammation and possible infection of the outer ear canal. She prescribed Maxitrol; Nasacort, an allergy medication/decongestant; and Debrox, an ear wax removal treatment.

There is no evidence that Dr. Henze at any point considered the possibility that Mr. Meneweather's condition might be serious enough to warrant further testing or a referral to an ear specialist.

Mr. Meneweather was next seen by a different physician at the prison, Dr. Okezie, on November 9, 2018. He again reported having hearing loss, as well as a "ringing noise" (i.e., tinnitus) for at least two months. Dr. Okezie's notes suggest that he suspected "chronic serious otitis media." He put in a request to have Mr. Meneweather

---

[3] The eustachian tube connects the middle ear with the nasal-sinus cavity. Its function is to balance pressure in the middle ear and to drain fluid from the middle ear.

seen by a specialist at the University of Illinois Ear, Nose, and Throat Center. Dr. Okezie is not named as a defendant in this case.

The next relevant event involves "collegial review," the process undertaken by Dr. Henze's and Dr. Okezie's employer Wexford Health Sources—which contracts to provide medical care to imprisoned persons in Illinois—to determine whether to allow an imprisoned person to see an outside physician. The collegial review took place in early or mid-November 2018, and it was done by Dr. Stephen Ritz, who is named as a defendant. At the time, Dr. Ritz was the Wexford's Corporate Utilization Management Director; currently, he is Wexford's Chief Medical Officer.

Dr. Ritz reviewed Dr. Okezie's referral request, which stated as its basis the following: retracted, hyperemic, no light reflex, right tympanic membrane; treated twice for otitis media; hearing loss and ringing in the right ear for two months. Dr. Ritz declined to approve the referral of Mr. Meneweather to a specialist. He instead approved an "alternate treatment plan" consisting of on-site treatment at the prison with a course of Medrol Dosepak, a steroid used to treat inflammation; and Claritin, an allergy medication often used as a decongestant.

On what appears from the records to be a later date in November 2018, Dr. Ritz considered a request by Dr. Okezie for an audiology consult for Mr. Meneweather. Dr. Ritz instead determined that an audiology test should first be done on-site at the prison, after 8 to 12 weeks of treatment under Dr. Ritz's "alternate treatment plan." Dr. Ritz ultimately approved a referral of Mr. Meneweather to an outside audiologist, but not until mid-January 2019. The audiologist determined that Mr. Meneweather had a "sensorineural" hearing loss in his right ear, which means hearing loss caused by

damage in the inner ear, typically nerve-related damage. Mr. Meneweather's hearing loss in his right ear is apparently permanent. He was approved for a hearing aid in late February 2019, at age 36.

Mr. Meneweather's court-appointed counsel retained an expert to review the evidence and render an opinion regarding the conduct of Dr. Henze and Dr. Ritz. The expert, Dr. Alan Pollak, is a highly experienced ENT specialist and surgeon. Dr. Pollak's report and deposition testimony reflect that he is quite critical of the care rendered by Dr. Henze and of Dr. Ritz's denial of outside specialist treatment.

Regarding Dr. Henze, Dr. Pollak says that Dr. Henze's reported findings upon her August 2018 examination were not consistent with Mr. Meneweather's report of a sudden hearing loss and the absence of any report of trauma to his ear. Dr. Pollak also notes, among other things, that the sort of acute otitis media reported by Dr. Henze is almost always associated with pain, but Mr. Meneweather reported no pain—strongly suggesting an incorrect diagnosis. Dr. Pollak also opines that Dr. Henze's prescription of Bactrim and Chlor-Trimeton was neither necessary nor appropriate "based on the clinical presentation of sudden hearing loss and tinnitus with no associated pain." Def.'s Ex. 9 (Dr. Pollak report) at ECF p. 140 of 178.

On the key issue regarding Dr. Henze, Dr. Pollak states that standard treatment guidelines indicate that "based on [Mr. Meneweather's presentation], sudden sensorineural hearing loss should have been considered initially as a high priority diagnosis." *Id.* Dr. Pollak further states that if Dr. Henze had conducted a tuning fork examination at the time, which he describes as "the standard of care," this "would have immediately distinguished a conductive hearing loss from a sudden sensorineural

5

hearing loss," which would have enabled Mr. Meneweather to get appropriate care immediately. *Id.* (It appears, however, that Dr. Henze did not have access to a tuning fork at the prison.) Among other criticisms of Dr. Henze's treatment, Dr. Pollak says that her later assessment that Mr. Meneweather's hearing loss resulted from eustachian tube dysfunction is unsupported by the medical records and would not be an appropriate diagnosis for sudden hearing loss and persistent tinnitus.

Regarding Dr. Ritz, Dr. Pollak opines (among other things) that his "alternative treatment plan" had no appropriate medical basis and that Dr. Ritz bypassed obvious and available opportunities for diagnostic tests that would have shown Mr. Meneweather's actual condition—which, Dr. Pollak again says, was not an ear infection or a eustachian tube dysfunction. Dr. Pollak essentially opines that the record does not reflect any medically appropriate basis for Dr. Ritz to overrule Dr. Okezie's recommendation to refer Mr. Meneweather to an outside specialist.

Defense expert Dr. Tami disagrees with most, if not all, of Dr. Pollak's opinions. But at the present stage, the Court must view the evidence in the light most favorable to Mr. Meneweather, the non-moving party. A reasonable jury could accept Dr. Pollak's opinions and reject Dr. Tami's. So the Court sets aside Dr. Tami's opinion for present purposes, with one exception as noted below.

## Discussion

Mr. Meneweather's claim arises under the Eighth Amendment's prohibition against cruel and unusual punishment. The Eighth Amendment prohibits deliberate indifference to the serious medical needs of an imprisoned person. *See, e.g.,* Arce *v. Wexford Health Sources Inc.*, 75 F.4th 673, 678 (7th Cir. 2023). The defendants do not

6

dispute that Mr. Meneweather's ear condition and reported sudden hearing loss amounted to a serious medical condition. So the remaining questions are whether he has presented evidence that would permit a reasonable jury to find that the defendants were deliberately indifferent in treating his condition and that their inadequate care caused him harm. *See id.* As the Seventh Circuit stated in *Arce*:

> Deliberate indifference requires something more than negligence or even malpractice. Proving deliberate indifference can be difficult in situations where a medical professional has provided at least some treatment in response to a plaintiff's complaints. But we have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment. More is necessary. For example, a plaintiff may show deliberate indifference by showing that a medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.

*Id.* at 678–79 (7th Cir. 2023) (internal quotation marks, brackets, and citations omitted).

The sufficiency of Mr. Meneweather's evidence to prove the defendants' deliberate indifference is hotly contested. But viewing the evidence, including in particular Dr. Pollak's report and testimony, in the light most favorable to Mr. Meneweather (as the law requires), the Court concludes that a reasonable jury could find that their treatment decisions were such a substantial departure from accepted standards that they reflected deliberate indifference to Mr. Meneweather's condition.

Specifically, a reasonable jury could find that Dr. Henze disregarded an obvious explanation for Mr. Meneweather's sudden hearing loss—indeed, Dr. Pollak would say, the only explanation that comported with what Mr. Meneweather reported and his signs and symptoms—and instead followed treatment that, in Dr. Pollak's opinion, was (and would be expected to be) entirely ineffective. With regard to Dr. Ritz, a reasonable jury

7

could find that his expressed concerns over cost overrode proper medical judgment and led him to overrule Dr. Okezie's referral to an outside specialist in favor of an entirely ineffectual "alternative treatment plan" that amounted to, at best, shutting the barn door after the horses had already left.

The defendants argue that little of significance may appropriately be drawn from Dr. Pollak's opinions regarding their compliance with standards of care, as he is an ENT specialist and they are not. But Dr. Pollak's testimony covered this seeming gap. He described his extensive familiarity with the treatment of ENT conditions, including reported hearing loss, by general practitioners and family medicine professionals—who typically see his patients before referring them to him. And Dr. Pollak explained in detail how he believed Dr. Henze's and Dr. Ritz's actions did not measure up to those standards. Any argument that Dr. Pollak was imposing too high a standard arguably might affect the weight to be given to his opinions by a jury, but there is no appropriate evidentiary basis to disregard his opinions entirely or exclude them from evidence.

The defendants also argue that Dr. Pollak's opinion establishes, at most, conduct that fell short of the standard of care—in other words, negligence—and not deliberate indifference. Under the law, however, conduct that represents a significant departure from the standard of care may amount to deliberate indifference because it reflects the lack of application of professional judgment. As the Court has concluded, a reasonable jury could so find in this case with respect to both Dr. Henze and Dr. Ritz.

Mr. Meneweather's Eighth Amendment claim founders, however, on the issue of causation. Specifically, there is no evidence from which a reasonable jury could find that any different treatment by Dr. Henze or by Dr. Ritz would have prevented or

8

forestalled his hearing loss. Dr. Pollak's written report largely focuses on the inappropriateness of the care rendered by Dr. Henze and Dr. Ritz. On the question of causation, Dr. Pollak's report and deposition include only the following opinions and evidence bearing on causation:

(1) A proper examination by Dr. Henze in August 2020—specifically, a tuning fork examination—"would have corrected her misdirected efforts and would have provided Mr. Meneweather the opportunity to receive the standard of care for a sudden sensorineural hearing loss within a 72-hour window." Def.'s Ex. 9 at ECF p. 141 of 178.

(2) "[A]udiometric testing was not performed in a timely fashion and delayed and prevented appropriate treatment." *Id.* at ECF p. 146 of 178.

(3) "[Defense expert] Dr. Tami in his own submission states 'the diagnosis of nerve hearing loss must be made quickly so that treatment can be initiated within the first 72 hours.'" *Id.* at ECF p. 147 of 178.

(4) Dr. Pollak testified as follows during his deposition:

Q: And once a diagnosis of sudden sensorineural hearing loss is made, what would have been the appropriate treatment?

A: The appropriate treatment would be . . . within usually 72 hours as stated by their own expert ideally, or two weeks is often referred to in the literature, receive high-dose steroids with or without formal audiometric testing and then immediately at the time it started refer for baseline formal audiometric testing.

Q: And can a delay in the start of treatment result in permanent hearing loss that – or can a delay forfeit the opportunity to reverse hearing loss?

. . .

A: Okay. The delay can obviously—delay can obviously, No. 1, prevent one from getting adequate treatment for that disease process; No. 2, prevent someone from getting a bunch of unnecessary treatments that aren't required based on that diagnosis and all that goes with that.

9

> And so, yes, I mean you want to get it going as soon as possible, and that's certainly supported by the guidelines in 2012 and supported by the guidelines in 2019, which are based on years of literature . . . .
>
> So the answer would be yes and certain then tell you [that] you don't need to do this, this, this, and this.

Def.'s Ex. 9 (Dr. Pollak dep.) at 248-50.

In his report, as just noted, Dr. Pollak refers to statements by defense expert Dr. Thomas Tami. Dr. Tami's report says the following relating the issue of causation:

> 8. Early medical intervention for sudden neurosensory hearing loss is controversial. First, the diagnosis of nerve hearing loss must be made quickly so that treatment can be initiated within the first 72 hours. This is difficult in even the best of settings. The most common treatment provided in this setting is corticosteroids. Steroids, even in the best of situations has not been shown to significantly change the ultimate outcome of the hearing loss. So, any delay in getting to the audiologist or to the otolaryngologist would have had no impact on the ultimate outcome. He would still have a right sided nerve hearing loss.

Def.'s Ex. 7 (Dr. Tami Report) at 37.

The Court appreciates that there may be no good way to know for certain what would have happened if Mr. Meneweather had received the sort of treatment that Dr. Pollak opines was appropriate and consistent with the accepted standard of care. But as the Court has discussed, before Mr. Meneweather can prevail, the law requires a showing that the defendant's inadequate treatment caused him harm. In this case, that requires Mr. Meneweather to offer evidence that would permit a reasonable jury to find not simply that he should have gotten better treatment, but that the failure to provide that treatment proximately caused his hearing loss—in other words, that it is reasonably likely that his hearing loss would have been prevented or avoided if there had been proper treatment.

Dr. Pollak's testimony falls short of this mark, and neither Dr. Tami's testimony nor

10

anything else fills in the gap. Dr. Pollak does not, for example, offer any percentage or probability evidence (supported by medical literature, his own experience, or otherwise) for how often, in similar situations, prompt treatment with high-dose steroids prevents or forestalls hearing loss. In fact, on this point, all the record contains is Dr. Tami's statement to the contrary: that "[s]teriods, even in the best of situations[,] ha[ve] not been shown to significantly change the ultimate outcome of the hearing loss. So, any delay . . . would have had no impact on the ultimate outcome. He would still have a right sided nerve hearing loss." Def.'s Ex. 7 (Dr. Tami Report) at 37. There is no evidence supporting the opposing proposition.

This defeats the element of causation with regard to Dr. Henze's treatment. Regarding Dr. Ritz, Mr. Meneweather cannot establish causation for the same reason and also because, by the time Dr. Ritz reviewed the case during the "collegial review," the window that both Dr. Pollak and Dr. Tami describe for treating sensorineural hearing loss had already closed months earlier.

In sum, based on the evidence before the Court, no reasonable jury could find that the deliberate indifference of either Dr. Henze or Dr. Ritz caused injury to the plaintiff. Specifically, it is speculative on the record before the Court whether use of appropriate testing by Dr. Henze herself, or a quick referral to an outside specialist who could do that testing, would have resulted in treatment that would have prevented or forestalled the loss of Mr. Meneweather's hearing. The defendants are therefore entitled to summary judgment.

## Conclusion

For the reasons stated above, the Court grants the defendants' motion for

summary judgment [dkt. no. 112] and directs the Clerk to enter judgment stating as follows: Judgment is entered in favor of defendants and against plaintiff.

Date: January 5, 2024

_____
MATTHEW F. KENNELLY
United States District Judge